[Cite as *State v. Reillo*, 2024-Ohio-3307.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                        No. 113531

    v.                           :

NELSON REILLO,                          :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** August 29, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-680671-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Karen Greene, Assistant Prosecuting Attorney, *for appellee*.

Russell S. Bensing, *for appellant*.

SEAN C. GALLAGHER, J.:

{¶ 1} Nelson Reillo appeals his convictions for rape and gross sexual imposition, which resulted in an aggregate life term of imprisonment with the possibility of parole after 15 years. For the following reasons, we reverse Reillo's convictions and remand for a new trial.

{¶ 2} At the outset we note that reversing convictions based on manifest weight is a rare occurrence. Our determination, and thus our view that this case is a rare and exceptional case requiring reversal, should be limited to the facts and circumstances of this case. It should not be read as an expansion of any existing legal standard.

{¶ 3} The facts underlying the convictions are established through the testimony of the 20-year-old alleged victim, E.C., recounting two encounters approximated to have occurred 12 years prior. Sometime in the year 2020, E.C., who was 17 years old at the time, told a medical professional about Reillo's alleged abuse that occurred when E.C. was approximately eight years old. It does not appear that any details of the abuse were then provided, but the medical provider was obligated to report the disclosure to the authorities. Nevertheless, and for unknown reasons, the State did not obtain an indictment until three years after the initial disclosure and investigation.

{¶ 4} E.C. is the youngest of three siblings, the eldest being seven years older. E.C. began seeing mental health professionals during high school but did not disclose the sexual abuse to them, claiming that as a sophomore in high school, "I was not out with that information at that time, so I didn't get to talk about it." Tr. 386:2-5. However, E.C. also claimed to have told an older sister and two friends a year before starting that therapy. Neither the sister nor the friends testified, nor is the extent of those disclosures known. E.C. claimed to have told the friends because "I had never told anyone before and it was starting to weigh on my mental health

and I thought that it would be nice to talk to someone about it." Tr. 398:6-9. According to E.C.'s trial testimony, E.C.'s sister "guessed" that the abuse had occurred at the time of that disclosure. It was also claimed the disclosure was not immediate when E.C. was "eight, when she's in middle school, [and] when she's in high school" because "it does make sense that a kid in that situation would want to protect their mom." Tr. 496:12-15.

{¶ 5} The State presented four witnesses at trial, three of whom provided no relevant evidence establishing proof of the alleged criminal conduct. The medical professional had no independent recollection of any statements beyond E.C. reporting having been "sexually abused." The social worker testified to interviewing E.C. following the disclosure, but she does not appear to have been provided any details of the alleged abuse, just a blanket statement that it occurred. Also, on this issue the State made a point to inquire into whether E.C. disclosed any details of the sexual assaults to the medical care provider or social worker following the initial disclosure. At first, E.C. claimed to have done so, but in follow up, the State asked for clarification:

> Q. Okay. Just to clarify and take you back before the video interview with the medical exam when you tell your pediatrician. Did you tell your pediatrician the details that you are telling us here today or did you keep it general with your pediatrician?
>
> A. I kept it general.

Tr. 396:18-24.

{¶ 6} The detective testified that the investigation consisted of interviewing E.C.'s sister and mother, but he inexplicably did not interview E.C., E.C.'s brother, or father, or otherwise conduct any other form of investigation to verify the allegations contained in the reporting. Tr. 452:1-15. Importantly, despite his 20-minute interview of E.C.'s sister, to whom the disclosures had allegedly been made before 2020, the detective had no information about any prior disclosures made by E.C. Tr. 455:17-23. E.C. seemingly confirmed that fact during cross-examination, despite testifying to the contrary during the direct:

> Q. Okay. And you visited with your dad, but you didn't tell your dad, correct?
>
> A. Correct.
>
> Q. And you [n]ever told your brother, correct? *And you never told your sister?*
>
> A. Yes.

(Emphasis added.) Tr. 420:19-24.

{¶ 7} In light of the lack of details provided to the medical care provider and social worker, when coupled with the detective's lack of an interview with E.C., it appears from this record that the extent of the alleged sexual abuse, beyond that which was included in the indictment, was not disclosed before trial. This observation is borne out by the State's opening statement, which was limited to generic statements that the State intended to call E.C. to testify to "how she knows Mr. Reillo and what happened to her." The prosecutor did not elaborate on that statement.

{¶ 8} Turning to the facts underlying the offense, E.C.'s mother had a relationship with Reillo, who moved into the family's home for less than a year. E.C. was unable to provide a definitive time frame, and no other evidence demonstrated when Reillo lived in the same home as E.C. E.C. could not recall at what time of year the encounters occurred. The State guessed the events occurred between July 2011 and July 2012 in light of E.C.'s date of birth and testimony that E.C. was "about eight" years old at the time — using the year E.C. was eight years old as the date of the conduct. E.C. testified that on two occasions, Reillo committed acts constituting rape and gross sexual imposition, both incidents occurring in the bedroom Reillo shared with E.C.'s mother.

{¶ 9} Once while sitting on Reillo's lap, E.C. described being moved to the desk where he was sitting. Reillo removed E.C.'s pants and put his mouth on E.C.'s vagina. There is no evidence that Reillo removed E.C.'s underwear. Tr. 393:11-14. E.C. could not recall if anything was said, if anyone else was present in the home, or how the encounter ended, much less provide any other detail surrounding the encounter — with one exception. There was testimony of a memory that E.C. "could feel like my [vaginal] lips like opening" at the time of the assault. Tr. 392:7-20. That testimony, however, was elicited through a leading inquiry by the State after E.C. first provided a vague, almost nonresponsive answer to a similar narrative question probing for details of the assault. Tr. 392:4-12.

{¶ 10} E.C. described that in a second encounter, Reillo was on the bed, lying on his back. He had a large towel only covering his "private area," but his state of

undress was unknown. He placed E.C. "over" his "private area" but "on" the towel and shifted E.C. up and down and side to side. E.C. had no recollection of any contact with his genitalia, and as with both encounters, could not remember if anyone was in the home at the time or whether that incident occurred before or after the other one. E.C. could not recall any other detail, such as how the encounter ended, any description of the towel beyond it being large, or whether Reillo said anything during or after the assault.

{¶ 11} There were also allegations that Reillo took a snack chip from E.C.'s mouth with his tongue while both were seated on a couch and that Reillo walked in the bathroom while E.C. was taking a bath, remaining there for an uncomfortable moment. Again, no specific details could be recalled beyond that, including any time frame for those events.

{¶ 12} Thus, E.C.'s testimony largely tracked, and was limited to, the allegations presented in the indictment. Nevertheless, it is also noteworthy that the State's closing statement blurred the lines of the facts introduced into evidence. For example, the State claimed that evidence demonstrated that Reillo removed E.C.'s underwear during the rape (cunnilingus), despite E.C. expressly stating the lack of memory as to that fact. When describing the allegations pertaining to the second rape count (vaginal penetration), the State claimed that Reillo was on the bed naked,

a fact not directly introduced into evidence.[1] Doubling down on the statement regarding Reillo's state of undress, the State then told the jury that E.C.'s description of being moved around, "[t]o me, that sounds like vaginal intercourse." The State, however, failed to present any evidence of penetration.

{¶ 13} Following the State's case, the jury found Reillo guilty of rape (cunnilingus) and gross sexual imposition of a victim who was under the age of 13.[2] Reillo was acquitted of a second rape count alleging vaginal penetration, although what evidence that count was based on for the purposes of the Crim.R. 29 motion advanced at trial is unclear. E.C. discussed the two incidents, only one of which arguably constituted rape as statutorily defined. R.C. 2907.02(A)(1)(b); R.C. 2907.01(A). There was no evidence presented demonstrating vaginal penetration for the purposes of the second rape count.

---

[1] Circumstantial and direct evidence are equally probative under *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus, for the purposes of sufficiency review. *State v. Rodano*, 2017-Ohio-1034, ¶ 35-36 (8th Dist.). Although equally probative as to facts of consequence, circumstantial evidence is not necessarily equally credible. The issue in this case is not any reliance on inferences derived from the limited facts presented, but the overall credibility of the State's case in general. Here, E.C. testified that the large towel was "only covering" Reillo's "private area." Instead of asking for clarity, the State left Reillo's state of undress to the imagination. Our observation of the State's closing should not be construed as an attack on circumstantial evidence. Instead it is noted solely because relying on inferences in situations where one would reasonably expect direct evidence weighs on credibility concerns.

[2] Count 3 of the indictment alleged that Reillo "unlawfully did have sexual contact, to wit: rubbed victim's body against his naked body, with [E.C.] 07/23/2003 not his spouse, and the age of [E.C.] 07/23/2003 at the time of said sexual contact was under 13 years, to wit: DOB: 07/23/2003." It is not clear from the record whether the indictment was amended to remove the nakedness allegation, but the jury was nonetheless charged, in pertinent part, with determining whether Reillo had sexual contact with E.C. without regard to his state of undress. Tr. 517:21-518:8.

{¶ 14} Reillo captions his two assigned errors separately, but throughout his briefing in the first assignment of error, he claims that his convictions are against the weight of the evidence because E.C.'s story was vague and "made little sense," especially considering the 12-year delay in disclosing the alleged abuse. "Vague" is not the correct characterization, but we agree with Reillo's sentiment. In this case, the State provided evidence largely tracking the allegations in the indictment, but nothing further. Typically, it is the details related to the alleged conduct that open the door to credibility determinations. The evidence in this case is not so much vague as it is conclusory: testimony from E.C. was presented that the offenses occurred, but no context or surrounding details were produced by the State — a fact the State leaned into during closing argument, telling the jury that E.C. "remembers what is important and what matters to the State. [E.C.] is able to remember those elements that [the State is] required to prove beyond a reasonable doubt. We are not required to prove anything extra." Tr. 495:15-20. This is not to suggest that the State is required to prove anything extra but reflects the factfinder's ability to render credibility determinations regarding the case as a whole. Thus, although that evidence is sufficient, the overall credibility of that evidence is another matter.

{¶ 15} This case is unique in that the only evidence of the crime, which was by and large limited to the bare elements of each charged offense, came from E.C.'s testimony, which given the timeline and E.C.'s age, was understandably riddled with uncertainties. The State's case nonetheless entirely depended on the truthfulness of a witness, but the assessment of a witness's credibility incorporates two distinct

concepts: "the witness' truthfulness and the witness' ability to accurately perceive and communicate that about which the witness is testifying." *Kravitz v. Long Island Jewish-Hillside Med. Ctr., Community Health Program, Inc.*, 113 A.D.2d 577, 582 (N.Y. App. 1985). A witness can be perceived as being truthful, but that alone does not establish credibility in the legal sense, especially as it pertains to the State's burden to overcome the presumption of innocence.

{¶ 16} When evaluating a claim that a jury verdict is against the weight of the evidence, appellate courts "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997); *State v. Jordan*, 2023-Ohio-3800, ¶ 17. A manifest-weight challenge focuses on the credibility of the evidence presented and questions whether the State met its burden of persuasion at trial to prove the elements of the crimes beyond a reasonable doubt. *State v. Whitsett*, 2014-Ohio-4933, ¶ 26 (8th Dist.), citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Notwithstanding, reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs

heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 17} In this case, we are asked to review the credibility of the State's case that relies on conclusory allegations of sexual misconduct having occurred over a decade earlier. Reillo also highlights the impact on the credibility of the State's case given the length of delay between the events and the disclosure. According to Reillo, E.C.'s reason for not disclosing the sexual misconduct earlier was not credibly explained by the State. The State did not directly answer that assertion, such as presenting the jury with evidence from an expert on sexual-abuse disclosures involving children as typically relied on in such cases. *See, e.g., State v. Wright*, 2024-Ohio-851, ¶ 54 (1st Dist.). Instead, the State simply states that E.C.'s "testimony was credible and the jurors were the appropriate persons to make that determination." But that argument misses the point. As the "thirteenth juror," this panel must consider the overall credibility of the State's case.

{¶ 18} On this point, we acknowledge the challenging position the State found itself in by solely relying on the testimony of a witness recounting decade-old information that was observed through the lens of a young child. E.C. was understandably unable to recount much of the details surrounding the allegations. But even understanding that, we cannot overlook that the few details as to the offenses, beyond the testimony establishing each element of the offense, were obtained through leading questions, which is generally an unreliable substitute for narrative testimony because it becomes a question of whether the witness was

agreeing with the question or independently recollecting the events. This impacts the overall credibility of the case presented. Further, there was no attempt to address the varying statements of E.C. regarding the disclosures, nor was there any attempt to rehabilitate the lack of memory as to the details surrounding the allegations of the crimes themselves, which directly weigh on a witness's ability to accurately perceive and communicate the events. Although it is a tough position for a prosecutor to be in during trial, we cannot ignore the overall effect it had on the case. There may be explanations or further evidence to harmonize all these inconsistencies, but none were provided within the current record. Instead, the State relies on the notion that "appellate courts must be mindful that the credibility of the witnesses and the weight of the evidence are matters primarily for the trier of fact to assess." *State v. Nitsche*, 2016-Ohio-3170, ¶ 42 (8th Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Any reliance on that line of authority as the sole basis to affirm the convictions is misplaced.

{¶ 19} *DeHass* and its progeny such as *Nitsche* are based on the sufficiency-of-the-evidence review and are not applicable to the *Thompkins* standard for reviewing the weight of the evidence. *DeHass* at 231, 234 ("[I]t is apparent that the jury believed the testimony of the prosecuting witness and the corroborating evidence presented by the state, and an examination of the bill of exceptions *demonstrates that such evidence was sufficient to support the verdict of guilty. . . .*"). (Emphasis added.) *Id.* at 231. As the Ohio Supreme Court noted in *DeHass*, the appellate panel had reversed the conviction over a dissenting opinion,

finding the evidence insufficient to support the conviction. *Id.* Thus, the only review under the Ohio Constitution that could result in a reversal of the conviction was based on the sufficiency of the evidence. *Id.* at paragraph one of the syllabus. In reviewing the sufficiency of the evidence, the Ohio Supreme Court noted that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *Id.*; *see also Smathers v. Glass*, 2022-Ohio-4595, ¶ 32 (citing *DeHass* as support in explaining that the summary judgment standard does not involve credibility determinations from the trier of fact's responsibility to review credibility determinations at trial). *DeHass* and its commentary on the presumption in favor of the factfinder's verdict is only applicable to sufficiency analysis and has no bearing on manifest-weight challenges.

{¶ 20} Notwithstanding, we acknowledge that the Ohio Supreme Court has opined that appellate courts must be mindful of a presumption in favor of the finder of fact, which has been described as

> determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *
>
> If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.

*Eastley v. Volkman*, 2012-Ohio-2179 ¶ 21, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, fn. 3 (1984), and 5 Ohio Jur.3d, Appellate Review, § 60, at 191-192 (1978). *Eastley* arguably implied that the presumption in favor of

the verdict, from the now-defunct civil manifest-weight review, still exists in manifest-weight challenges. That presumption in favor of the factfinder, however, was the underlying basis for distinguishing the weight-of-the-evidence review as between civil and criminal cases and is derived from *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), which was effectively overruled by *Eastley* at paragraph two of the syllabus.

{¶ 21} Before *Eastley,* when reviewing the weight of the evidence in civil cases, courts of review provided deference to the trier of fact's credibility conclusions, which was based on maintaining the presumption in favor of the verdict following a bench trial:

> The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony. The interplay between the presumption of correctness and the ability of an appellate court to reverse a trial court decision based on the manifest weight of the evidence was succinctly set forth in the holding of this court in *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279 [8 O.O.3d 261]:
>
> Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.

*Seasons Coal Co.* at 80; *see also DeHass,* 10 Ohio St.2d 230, 231. Thus, the presumption established in *Seasons Coal Co.* favored merging the concepts of weight and sufficiency for civil cases, a past concept expressly recognized and overruled by *Eastley* at ¶ 16, citing *State v. Wilson,* 2007-Ohio-2202, ¶ 26.

{¶ 22} Although *Eastley* mentioned that deference was to be given to the factfinder's verdict, the Ohio Supreme Court has never applied that presumption in practice. This is for good reason. That analysis is not part of the syllabus holding of *Eastley* and was stated in passing. *See, e.g., State v. Jones*, 2020-Ohio-6729, ¶ 27 (concluding that the Eighth District erred in relying on statements made in passing in an earlier decision). But more important, *Thompkins* contains no language providing deference to the trier of fact's credibility determinations. *See, e.g., State v. Martin*, 2022-Ohio-4175, ¶ 23, 26 (concluding that because appellate courts cannot weigh the credibility of the evidence in a probable cause hearing and must defer to the factfinder, those determinations are not subject to manifest-weight challenges); *see also State v. Knuff*, 2024-Ohio-902, ¶ 207-214 (reviewing the weight of the evidence without mentioning, discussing, or applying any deference to the trier of fact's credibility determinations); *State v. Nicholson*, 2024-Ohio-604, ¶ 69-79 (same); *State v. Garrett*, 2022-Ohio-4218, ¶ 136-142 (same).

{¶ 23} If appellate courts deferred to the factfinder's credibility determinations in reviewing the weight of the evidence as the State suggests, then there would be no difference between that and the sufficiency analysis, in effect merging the separate concepts of sufficiency and weight, as once was the standard for civil cases. *Eastley*, 2012-Ohio-2179, at ¶ 16, citing *Wilson* at ¶ 26. This is not to say that reversing a conviction as being against the weight of the evidence comes easily. Reversing a conviction based upon the weight of the evidence should occur "only in the exceptional case." *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin*,

20 Ohio App.3d at 175. Relying on some presumption in favor of the verdict or deferring to the factfinder's credibility determinations erodes the already Herculean task of demonstrating that a conviction is against the weight of the evidence, a defendant's truly last resort following trial. If appellate panels defer to the trier of fact's credibility determinations, which resulted in the finding of guilt or there would not be an appeal, there would be no reason to advance a manifest-weight challenge. Under *Thompkins*, the review is much broader than that.

{¶ 24} Notwithstanding, and although we recognize that a reversal based on the conviction being against the weight of the evidence is to be rarely entertained, based upon our review of the entire record, weighing the evidence and all reasonable inferences, assessing the overall credibility of the witness as it relates to the State's case, we conclude that the jury clearly lost its way and created a manifest miscarriage of justice in this particular case by finding Reillo guilty of rape and gross sexual imposition. We reach this conclusion based on the foregoing discussion and based on the State's closing argument that tracked the language of the indictment and presented arguments that were not established by the facts presented at trial.[3]

{¶ 25} It is important to note that there is no suggestion that E.C. was being untruthful at trial or with respect to her disclosure. The credibility of the State's case

---

[3] This by no means should be taken as criticism of the State's conduct in this case, which is an extremely challenging case on both sides. The State is limited to the facts of the case as they exist, and this case undoubtedly presented significant hurdles considering the primary witness testified to events as seen through the eyes of a young child. But the difficulties of the case cannot mean we ignore inadvertent missteps that impact consideration of the case as a whole.

does not solely depend on whether a witness believes their testimony to be true or is considered truthful by the trier of fact, especially in consideration of a defendant's unqualified presumption of innocence at trial — a presumption the State must overcome by establishing the overall credibility of its case.[4] *In re Winship*, 397 U.S. 358, 364 (1970). Truthfulness of the witness is one discrete aspect of the credibility equation, and the State cannot rely on that aspect alone as it does in this case.

{¶ 26} Thus, today's decision is more a reflection of the overall credibility of the State's case in chief, the totality of the State's evidence, or lack thereof, and the lack of explanation resolving conflicting testimony from its sole witness. It is not the role of an appellate court, when sitting as the thirteenth juror under the weight-of-the-evidence standard of review, to determine whether the events actually transpired or to speculate as to the probability that something may have happened. It is more aptly described as determining whether the State has proven the criminal violations with credible evidence beyond a reasonable doubt in a court of law to overcome the defendant's fundamental right to the presumption of innocence. *See*

---

[4] As once recognized:

> The presumption of innocence is not an idle one, or a meaningless legal phrase that may be urged in behalf of the accused, or a mere matter of form, but it is a sheath which the law throws around the defendant for his protection; it is a substantial right inuring to the benefit of the accused upon every material fact necessary to constitute guilt. * * * The presumption of innocence remains with the accused throughout the trial, until overthrown by proof that excludes every reasonable doubt of guilt.

*Cleveland v. Fisher*, 1976 Ohio App. LEXIS 8402, *7 (8th Dist. 1976), quoting 56 Ohio Jur.2d, Witnesses, § 417, 854.

*Volkman*, 2012-Ohio-2179, at ¶ 19 ("'[M]anifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion . . . ."). On this point, we find merit to Reillo's first assignment of error challenging the weight of the evidence presented at trial.

{¶ 27} Reillo's convictions for rape and gross sexual imposition are reversed, and the matter remanded for a new trial.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MARY J. BOYLE, J., CONCUR